**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

CINDA PARISH,                                        :

                   Plaintiff,

  -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

                  Defendant.               :

Case No. 3:08-cv-421

District Judge Thomas M. Rose
Magistrate Judge Michael R. Merz

## REPORT AND RECOMMENDATIONS

Plaintiff brought this action pursuant to 42 U.S.C. §405(g) and 42 U.S.C. §1381(c)(3) as it incorporates §405(g), for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6${}^{th}$ Cir. 1986). Substantial evidence

is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988); *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984). However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner, supra.* If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion. *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423. To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy. 42 U.S.C. §423(d)(2).

To qualify for supplemental security benefits (SSI), a claimant must file an application and be an "eligible individual" as defined in the Social Security Act. 42 U.S.C. §1381a.

With respect to the present case, eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. §1382(a). To establish disability, a claimant must show that the claimant is suffering from a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §1382c(a)(A). A claimant must also show that the impairment precludes performance of the claimant's former job or any other substantial gainful work which exists in the national economy in significant numbers. 42 U.S.C. §1382c(a)(3)(B). Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits prior to the date that the claimant files an SSI application. *See,* 20 C.F.R. §416.335.

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520. First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1 (1990). If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national

economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed an application for SSD on March 29, 2002, alleging disability from February 1, 2002, due to depression, anxiety/panic attacks, chronic migraines/headaches, chronic stiffness and pain in her neck, shoulders, back and hips. *See* Tr. 92-94; 108. Plaintiff's application was denied initially and on reconsideration. *See* Tr. 55-63. Plaintiff filed an application for SSI on March 17, 2004, and that application was escalated to the hearing level. A hearing was held before Administrative Law Judge Daniel R. Shell who determined that Plaintiff was not disabled. (Tr. 396-413). The Appeals Council remanded the matter because it was unable to locate the record of the hearing before Judge Shell. (Tr. 415-18). On remand, Judge Shell held a hearing, (Tr. 765-804), and again determined that Plaintiff is not disabled. (Tr. 18-44). The Appeals Council denied Plaintiff's request for review, (Tr.7-9), and Judge Shell's decision became the Commissioner's final decision.

In determining that Plaintiff is not disabled, Judge Shell found that Plaintiff has severe degenerative disc disease with residual effects of spinal surgery, degenerative joint disease, chronic pain symptoms associated with fibromyalgia, periodic migraine headaches, and depressive disorder with anxiety features, but that she does not have an impairment or combination of impairments that meets or equals the Listings. (Tr. 37, ¶¶ 3, 4). Judge Shell also found that Plaintiff has the residual functional capacity to perform a limited range of light work. (Tr. 38, ¶ 5). Judge Shell then used section 202.21 of the Grid as a framework for deciding, coupled with a vocational expert's testimony, and found there is a significant number of jobs in the economy that Plaintiff is capable of performing. (Tr. 43, ¶10). Judge Shell concluded that Plaintiff is not disabled and therefore not entitled to benefits under the Act. *Id.*, ¶11.

Plaintiff was hospitalized August 31, 2000, to September 2, 2000, after receiving

4

treatment in the emergency room following a suicide attempt. (Tr. 161-71). Plaintiff was treated with individual and group therapy and medications and she was discharged with the diagnosis of major depression. *Id.*

The record contains a copy of Plaintiff's treatment record from Dr. Reitz dated March 22, 1999, through August 2, 2002. (Tr. 209-34). Those records reveal that Dr. Reitz evaluated and treated Plaintiff for various medical complaints and conditions including right hand and arm numbness, pain in multiple joints, neck pain, yeast infection, warts, suspected fibromyalgia, migraine, anxiety, and depression. *Id.* These records contain copies of test results which include x-rays of Plaintiff's hips performed on July 3, 2002, which were unremarkable, lumbar spine x-ray also performed on July 3, 2002, which revealed minimal degenerative changes of the disc spaces and some minimal retrolisthesis of L5-S1, and an x-ray of Plaintiff's spine which was performed on November 14, 2002, which showed minimal scoliosis. *Id.*

On June 10, 2002, Dr. Reitz reported that she had been treating Plaintiff for the past two years and that she continued to have recurrent, chronic depression that was resistant to multiple medications. *Id.* Dr. Reitz also reported that Plaintiff had seen a rheumatologist to rule out an autoimmune disorder and connective tissue disease and that she also had fibromyalgia. *Id.*

The record contains a copy of Plaintiff's treatment notes from Dr. Galbraith dated January, 1998, to July 31, 2002, and which reveal that Dr. Galbraith treated Plaintiff for her known adrenal hyperplasia and osteoporosis. (Tr. 193-208).

The record contains a copy of Plaintiff's mental health treatment notes from Wright Health Associates dated March 19, 1999, through August 22, 2002. (Tr. 235-68). Those records reveal that at the time Plaintiff was initially evaluated in March, 1999, her mood and affect were

5

depressed, her speech was normal, her thought processes were normal, and that she denied suicidal or homicidal ideations. *Id.* At that time, Plaintiff's diagnosis was identified as adjustment disorder with depressed mood due to partner relational problems and she was assigned a GAF of 65. *Id.* Plaintiff attended counseling and was treated with medications. *Id.*

Plaintiff consulted with rheumatologist Dr. Henderson on September 3, 2002, at which time Dr. Henderson reported that Plaintiff had some posterior paraspinal cervical tenderness, tenderness over the trapezius bilaterally and medial borders of the scapula, and that she had tenderness over the sacral notches as well as the trochanteric bursae and anserine bursae. (Tr. 269-77). Dr. Henderson identified Plaintiff's diagnoses as fibromyalgia syndrome and history of 21-hydroxylases deficiency requiring steroid replacement. *Id.* On October 3, 2002, Dr. Henderson reported that Plaintiff had no motor loss, limited motion in her joints and/or spine, and that she had difficulty doing fine and gross manipulation. *Id.*

Plaintiff continued to received treatment from Dr. Henderson through at least June 2007. *Id.*, Tr. 324-26, 353, 392, 680-99. During that time, specifically, in May, 2004, a pelvic x-ray revealed significant osteoarthritis. *Id.* Dr. Henderson opined in December, 2004, that Plaintiff would be unable to work due to fibromyalgia, degenerative disc disease, osteoarthritis and L5-S1 radiculopathy. (Tr. 688). In October, 2002, Dr. Henderson reported that Plaintiff's sedimentation rate and rheumatoid factor tests were normal, and that Plaintiff had diffuse tender points at eleven of the eighteen locations associated with fibromyalgia. (Tr. 271). In June, and August, 2005, Dr. Henderson again noted significant tender points consistent with fibromyalgia. (Tr. 681).

An MRI performed on January 9, 2003, revealed a herniated intervertebral disc at C5-C6 with mass effect on the spinal cord, a tiny protrusion at C6-C7, and a congenitally narrow

6

cervical canal. (Tr. 288, 315).

On February 3, 2003, treating neurosurgeon Dr. Kirschman noted that Plaintiff reported pain in her neck, shoulders, arms, and back with radiation to the lower back and hips, as well as burning in her neck and shoulders. (Tr. 315-16). Dr. Kirschman also noted that Plaintiff had intact arm and leg strength with mild, diffuse antalgic weakness in the arms. *Id.* On February 14, 2003, Dr. Kirschman performed an anterior cervical discectomy and fusion at C5-6. (Tr. 371-86). Plaintiff received post-operative treatment from Dr. Kirschman during the period March through August, 2003. (Tr. 311-13, 494-96). During that time, Dr. Kirschman noted that Plaintiff reported decreased neck and shoulder pain with some intermittent pain in her left arm. *Id.* In March, 2003, a lumbar spine MRI revealed very advanced degenerative disc disease at L4-L5 and L5-S1 and retrolisthesis of L5 on S1. (Tr. 305-06, 312).

The record contains a copy of Plaintiff's mental health treatment notes from psychiatrist Dr. Prada which reflect that Dr. Prada treated Plaintiff during the period May, 2003, and February, 2004. (Tr. 354-57). Dr. Prada noted that Plaintiff was depressed and despondent. *Id.* Dr. Prada reported in January, 2004, that Plaintiff had major depression, recurrent, and an anxiety disorder and he assigned Plaintiff a GAF of 40. (Tr. 327-29)

In November, 2003, Dr. Henderson reported that Plaintiff had significant restrictions of her ability to work due to pain caused by fibromyalgia, osteoarthritis, and cervical disc disease. (Tr. 317-23). Dr. Henderson opined that Plaintiff could sit, stand, and walk for one hour per day, lift and carry ten pounds occasionally, was not able to use either hand for simple grasping, pushing, pulling, or fine manipulation, was not able to perform repetitive leg motions, and that she could occasionally climb stairs, but that she could never bend, twist, reach, squat, kneel, or climb ladders

and scaffolds. *Id.* Dr. Henderson also opined that Plaintiff had several environmental limitations and would likely miss five days of work per month. *Id.* Dr. Henderson provided a similar assessment on June 28, 2007. (Tr. 673-679).

On February 3, 2004, Dr. Kirschman reported that Plaintiff was able to sit for six hours a day, stand for two hours a day, and walk for one hour a day, but that she could not perform those activities on a full-time basis. (Tr. 337-39). Dr. Kirschman also reported that Plaintiff could occasionally lift or push and pull ten pounds and carry twenty pounds. *Id.* Dr. Kirschman noted that Plaintiff could occasionally bend, twist, reach, and climb stairs, but that she could not squat, kneel, or climb ladders. *Id.* Dr. Kirschman noted further that Plaintiff had several environmental restrictions and would miss three to four days of work a month. *Id.* Dr. Kirschman opined that Plaintiff's complaints of pain had been consistent with her diagnosis and the clinical findings. *Id.*

Dr. Kirschman reported on February 19, 2004, that Plaintiff's cervical fusion was stable, but that she continued to have diffuse pain in her bilateral upper and lower extremities. (Tr. 336). Dr. Kirschman noted that Plaintiff's neurological examination was nonfocal and that she should be treated conservatively with medication, physical therapy, and/or pain management. *Id.*

Plaintiff consulted with neurologist Dr. Vandersluis, in April, 2004, who noted that Plaintiff had giveaway weakness in her arms due to pain, normal leg strength, decreased leg sensation, and an antalgic gait. (Tr. 346-47). In May, 2004, Dr. Vandersluis noted that Plaintiff had a normal EEG, that her EMG was without definitive or significant abnormality, and that an MRI of her brain was within normal limits. (Tr. 395). Dr. Vandersluis opined that Plaintiff did not need further treatment by a neurologist. *Id.*

The record contains a copy of Plaintiff's treatment notes from family physician, Dr.

Randall dated May 26, 2004, through June 8, 2007. (Tr. 601-72). Those records reveal that Dr. Randall treated Plaintiff for fibromyalgia, osteoporosis, spinal disc disease, hypothyroidism, hypertension, adrenal insufficiency, migraines and depression. *Id.* In November, 2004, Dr. Randall reported that Plaintiff was disabled from gainful employment. *Id.* On June 8, 2007, Dr. Randall reported that he had been treating Plaintiff since 2004, her main disability was the chronic pain and fatigue from fibromyalgia and that the medications she was taking produced some disability in that they were sedating and could interfere with her concentration and the ability to operate equipment. *Id.* Dr. Randall also reported that Plaintiff's cervical spine MRI documented arthritic changes, a lumbar spine MRI performed in 2006, revealed disc protrusion and multi-level degenerative changes, and that she had more than eighteen true multiple trigger points which produced pain, and that with the exception of her spinal arthritic changes, she had no other physical clinical findings to suggest other disease processes and therefore fibromyalgia was her diagnosis. *Id.* Dr. Randall noted that Plaintiff's pain was diffuse although most of the focus was around her cervical-lumbar spine, she also had occasional significant pain in the upper extremities and lower extremities. *Id.* Dr. Randall opined that Plaintiff was able to sit for four hours, stand for two hours, walk for one hour, and alternate those activities for four hours but that she could not comfortably sustain those activities on a full-time basis. *Id.* Dr. Randall also opined that Plaintiff was able to frequently lift up to ten pounds and occasionally carry up to ten pounds, that she was able to perform part-time sedentary work but no light work, that she would require one rest period of ten minutes every hour, that it would be appropriate for her to lie down for substantial periods during the day, and that she would likely be absent due to exacerbation of her condition for five or more days a month. *Id.*

Lumbar and cervical spine x-rays performed in December, 2004, revealed

9

degenerative changes at C4-C5 and slight retrolisthesis of L5 on S1. (Tr. 652). An MRI of Plaintiff's cervical spine performed in January, 2005, revealed a mild disc bulge at C4-C5 and C6-C7 with no evidence of cervical herniation or nerve root impingement. (Tr. 472). An MRI of Plaintiff's lumbar spine performed on January 7, 2005, revealed retrolisthesis at L5-S1, a small disc protrusion at L4-L5, moderate disc bulging at L4-L5, and mild disc bulging at L3-L4. (Tr. 684-85).

The record contains a copy of Plaintiff's treatment notes from psychologists Dr. Acus-Souders and Dr. Cordell dated December 9, 2004, through April 12, 2006. (Tr. 523-51). Those records reveal that during that time, Plaintiff received therapy and counseling for situational stressors and financial difficulties and that she was inconsistent in her attendance and participation in treatment. *Id.*

The transcript contains a copy of Plaintiff's treatment notes from psychiatrist Dr. Balstar dated August 8, 2006, through October 22, 2007. (Tr. 700-21). At the time Dr. Balstar initially evaluated Plaintiff, he reported that it had been a year since Plaintiff had received mental health treatment, that she was alert and verbally spontaneous, her mood was dysphoric, and that her affect was congruent. *Id.* Dr. Balstar also reported that Plaintiff's thoughts were clear and coherent, that her diagnosis was major depressive disorder, recurrent, rule out psychotic features, and he assigned her a GAF of 45. *Id.* On August 3, 2007, Dr. Balstar reported that he began treating Plaintiff in August, 2006, that she had struggled with severe anxiety and depressed mood, that sedation was a side effect of the medication she was taking, that she would need frequent breaks from routine responsibilities, that she was unable to remember procedures of a job, and that she could not sustain concentration for a reasonable period of time. *Id.* Dr. Balstar also reported that Plaintiff's diagnoses were major depression, recurrent, and post traumatic stress disorder and he

10

assigned her a GAF of 45. *Id.*

Treating pain specialist Dr. Smith reported in June, 2007, that he first evaluated Plaintiff in March, 2007, that her diagnoses included lumbar spine stenosis, lumbar disc bulge, arthritis, and fibromyalgia, and that he had treated her with transforaminal epidural blocks, lumbar facet injections and cervical trigger point injections all of which provided short-term benefits. (Tr. 588-600; *see also,* Tr. 748- 56). Dr. Smith opined that Plaintiff was able to sit and stand for fifteen minutes and walk for twenty minutes, but that she was not able to do all three combined for more than one hour in a workday. *Id.* Dr. Smith also opined that Plaintiff was able lift and carry ten pounds occasionally, was not able to perform fine manipulation, and that she should never use her feet and legs for repetitive motion. *Id.* Dr. Smith noted that his answers to functional capacity section of his report were based on Plaintiff's response to questions and were not a formal functional capacity. *Id.*

The medical advisor (MA) testified at the hearing that Plaintiff's orthopedic impairments did not meet or equal any listings. (Tr. 789-98). The MA also testified that based on medical testing, Plaintiff's musculoskeletal problems were not a significant factor, and that fibromyalgia appeared to account for a number of Plaintiff's symptoms. *Id.* The MA testified further that based on the diagnosis of fibromyalgia, Plaintiff would be limited to light or even sedentary activity. *Id.*

In her Statement of Errors, Plaintiff alleges that the Commissioner erred by rejecting her treating physician's and psychiatrist's opinions and by failing to find that she is disabled by the combination of her impairments. (Doc. 10).

In many disability cases, the cause of the disability is not necessarily the underlying

condition itself, but rather the symptoms associated with the condition. *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 247, (6th Cir. 2007). Where the symptoms and not the underlying condition form the basis of the disability claim, a two-part analysis is used in evaluating complaints of disabling pain. *Rogers, supra* (citations omitted). First, the ALJ will ask whether there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. *Id.* (citation omitted). Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities, *Id.* Stated differently, there is a two-step process for evaluating pain. First, the individual must establish a medically determinable impairment which could reasonably be expected to produce the pain. *See, Jones v. Secretary of Health and Human Services,* 945 F.2d 1365 (6th Cir. 1991), *citing, Duncan v. Secretary of Health and Human Services,* 801 F.2d 847 (6th Cir. 1986). Second, the intensity and persistence of the alleged pain are evaluated by considering all of the relevant evidence. *See, Jones,* 945 F.2d at 1366-70.

In assessing the medical evidence supporting a claim for disability benefits, the ALJ must adhere to certain standards. *Blakley v. Commissioner of Social Security,* 581 F.3d 399 (6th Cir. 2009). One such standard, known as the treating physician rule, requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because

> these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone of from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*Id.*, *quoting*, *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544, *quoting,* 20 C.F.R. § 404.1527(d)(2).

The ALJ "must" give a treating source opinion controlling weight if the treating source opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Blakley, supra, quoting, Wilson, supra.* On the other hand, a Social Security Ruling[1] explains that "[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record." *Blakley, supra, quoting,* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996). If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. *Blakley, supra, citing, Wilson, supra.* and 20 C.F.R. § 404.1527(d)(2).

Closely associated with the treating physician rule, the regulations require the ALJ to "always give good reasons in [the] notice of determination or decision for the weight" given to the claimant's treating source's opinion. *Blakley* 2009 WL 3029653 at *7, *citing,* 20 C.F.R. §404.1527(d)(2). Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator

---

[1] Of course, although Social Security Rulings do not have the same force and effect as statutes or regulations, "[t]hey are binding on all components of the Social Security Administration" and "represent precedent final opinions and orders and statements of policy" upon which the agency relies in adjudicating cases. 20 C.F.R. § 402.35(b).

13

gave to the treating source's medical opinion and the reasons for that weight." *Blakley, supra, citing,* Soc.Sec.Rul. 96-2p, 1996 WL 374188 at *5. The *Wilson* Court explained the two-fold purpose behind the procedural requirement:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. *Snell v. Apfel,* 177 F.3d 128, 134 (2nd Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Blakley, supra, citing, Wilson,* 378 F.3d at 544. Because the reason-giving requirement exists to ensure that each denied claimant received fair process, the Sixth Circuit has held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight" given "*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record." *Blakley, supra, quoting, Rogers v. Commissioner of Social Security.,* 486 F.3d 234, 253 (6th Cir. 2007)(emphasis in original).

Plaintiff's complaints of chronic and disabling pain are supported by the evidence of record, particularly the findings and opinions of her treating physicians.

Plaintiff's rheumatologist Dr. Henderson has been treating Plaintiff since September, 2002, and he has consistently reported over time that Plaintiff is disabled due to fibromyalgia, degenerative disc disease, osteoarthritis and L5-S1 radiculopathy. Fibromyalgia is a medical condition marked by "chronic diffuse widespread aching and stiffness of muscles and soft tissues." *Stedman's Medical Dictionary for the Health Professions and Nursing* at 541 (5th ed. 2005). The

Sixth Circuit has recognized that fibromyalgia can be a severe impairment and that, unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs. *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 243, (6th Cir. 2007), citing *Preston v. Secretary of Health & Human Services,* 854 F.2d 815, 820 (6th Cir. 1988)(per curiam). Fibromyalgia patients manifest normal muscle strength and neurological reactions and have a full range of motion. *Rogers, supra.* The process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials. *Id.* (citation omitted).

In support of his opinion, Dr. Henderson's treatment notes show significant tender points consistent with fibromyalgia. Dr. Henderson has noted that Plaintiff's pain is a limiting factor and her pain has been consistent. In addition to describing Plaintiff as unresponsive to treatment, Dr. Henderson has consistently opined that Plaintiff is not able to work and is totally disabled. Based on his long-term treating physician relationship with Plaintiff, Dr. Henderson also concluded that Plaintiff lacks the functional capacity to do even sedentary work. (Tr. 677).

Dr. Henderson's opinion is consistent with other physician-provided evidence of record. As the Court has noted in its review of the evidence, *supra,* every physician who has offered an opinion as to Plaintiff's residual functional capacity has opined that she his not capable of performing full-time work activity. The only evidence which arguably conflicts with these physicians' opinions are the reports and opinions of the MA and non-examining reviewing physicians. (Tr. 279-86).

Under these facts, this Court concludes that the Commissioner erred by rejecting Plaintiff's treating physician's opinion that she is disabled. Therefore, the Commissioner's decision

that Plaintiff is not disabled is not supported by substantial evidence on the record as a whole.

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to remand the matter for rehearing or to reverse and order benefits granted. The Court has the authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. §405(g). If a court determines that substantial evidence does not support the Commissioner's decision, the court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary of Health and Human Services,* 17 F.3d 171, 176 (6th Cir. 1994)(citations omitted); *see also, Newkirk v. Shalala,* 25 F.3d 316 (6th Cir. 1994).

This Court concludes that all of the factual issues have been resolved and that the record adequately establishes Plaintiff's entitlement to benefits. Specifically, as noted above, Plaintiff's long-term treating physicians Drs. Henderson, Smith, Kirschman and Randall have essentially opined that Plaintiff is not capable of performing full time substantial gainful activity. Accordingly, the Commissioner's decision that Plaintiff is not disabled should be reversed.

It is therefore recommended that the Commissioner's decision that Plaintiff is not disabled and therefore not entitled to benefits under the Act be reversed. It is further recommended that this matter be remanded to the Commissioner for the payment of benefits consistent with the Act.

December 29, 2009.

*s/ Michael R. Merz*
United States Magistrate Judge

# NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(C), (D), (E) or (F) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).